Justin M. Garbaccio, Esq.
OPPENHEIMER & CO. INC.
85 Broad Street, 25th Floor
New York, New York  10004
Tel.: (212) 668-8000
Fax.: (212) 667-6797
*Counsel for Plaintiff Oppenheimer & Co. Inc.*

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
|  |  |
| --- | --- |
| | : |
| OPPENHEIMER & CO. INC., | : |
| | :     19-CV-10800 |
| Plaintiff, | : |
| | : |
| -against- | : |
| | :     **COMPLAINT** |
| | : |
| INTERNET GOLD-GOLDEN LINES LTD. and | : |
| REZNIK PAZ NEVO TRUSTS LTD., as Trustee | : |
| For the Series C and Series D Debentures of | : |
| Internet Gold-Golden Lines Ltd., | : |
| | : |
| Defendants. | : |
| | : |

---------------------------------------------------------------x

Plaintiff Oppenheimer & Co. Inc. ("Oppenheimer" or "Plaintiff"), by and through its

attorneys, brings this action against defendants Internet Gold-Golden Lines Ltd. ("IGLD") and

Reznik Paz Nevo Trusts Ltd., as Trustee for the Series C and Series D debentures of IGLD (the

"Debenture Trustee" and together with IGLD collectively referred to as "Defendants"), and

alleges as follows:

**NATURE OF THE ACTION**

1.       This case arises from the Defendants inducing Oppenheimer to provide its

valuable time, resources and expertise as a financial advisor for the past year and accepting the

full benefits of Oppenheimer's work in avoiding financial ruin to IGLD and then seeking to

prevent Oppenheimer from receiving full and timely payment for its valuable services.

2.     In October 2018, defendant IGLD entered into an engagement agreement with Oppenheimer retaining it to act as a financial advisor to assist IGLD in connection with the sale of its holdings in B-Communications Ltd. ("BCOM").   In exchange for Oppenheimer's assistance, IGLD agreed to pay Oppenheimer a transaction fee of $1.5 million, among other compensation, set forth in the agreement.   Since October 2018, Oppenheimer has worked diligently to advise and assist IGLD on the transaction.

3.     In January 2019, IGLD ran into financial trouble and it was necessary to halt required payment to its bondholders.  The Board of Directors of IGLD resolved to work with the bondholders and brought all material decisions relating to the sale of IGLD's BCOM shares to the bondholders for approval.  As such, the Debenture Trustee, on behalf of the bondholders, wielded tremendous influence and significant control over the sale, and consequently IGLD.

4.     Notably, at that time, neither IGLD, nor the Debenture Trustee, terminated the engagement agreement.  Rather, the Debenture Trustee adopted the engagement agreement and became a key stakeholder in Oppenheimer's engagement.  The Debenture Trustee (through its representatives) specifically sought out Oppenheimer's expertise and advice, was present at strategic meetings and discussions between Oppenheimer and IGLD, participated in the negotiation of the terms with the purchasers and was required to approve the transaction with the ultimate purchasers of the BCOM shares, including an investment firm called Searchlight Capital Partners, L.P. ("Searchlight").  Oppenheimer relied on Defendants' representations and conduct, and continued to work towards closing a transaction for the sale of IGLD's BCOM shares.

5.     On June 24, 2019, IGLD executed a share purchase agreement to sell its holdings in BCOM to Searchlight.  The share purchase agreement contains a representation that IGLD

was obligated to pay Oppenheimer's fee.  As required by the share purchase agreement, IGLD commenced a Section 350  creditors' arrangement proceeding (the "Section 350 Proceeding") as IGLD would need creditor and court approval to close the transaction with Searchlight.  The share purchase agreement was, in fact, approved by IGLD's board, shareholders, and bondholders.  The district court in the Section 350 Proceeding also approved the share purchase agreement in the ruling in which it approved the transaction contemplated by that agreement.

6.    Following the execution of the share purchase agreement, Oppenheimer met with IGLD and representatives of the Debenture Trustee.  Both informed Oppenheimer that IGLD would not pay its full transaction fee.  Oppenheimer reminded IGLD and the Debenture Trustee of the obligation to pay and sought adequate assurance from IGLD that it would, in fact, pay the full transaction fee.  IGLD refused to provide adequate assurance that it would pay the fee in full at closing.  The Debenture Trustee has not provided any assurance that it will cause IGLD to pay the fee in full at closing.

7.    Instead, after the execution of IGLD's agreement, Defendants unveiled the second part of their plan.  Defendants have stated that they intend to file a second insolvency proceeding with the Israeli court to, among other things, avoid paying Oppenheimer its fee.  In light of IGLD's prior Section 350 Proceeding and the approval of the share purchase agreement by the court, this is a blatant abuse of the Israeli courts and a breach of the engagement agreement.  Indeed, the Defendants' plan has the effect of avoiding  payment to Oppenheimer and wrongfully retaining those funds for their own benefit.

8.    Consequently, Defendants have breached the parties' agreement and engaged in other unlawful conduct detrimental to Oppenheimer and, as such, are liable to Oppenheimer for its damages.

## JURISDICTION AND VENUE

9.      This Court has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between a citizen of New York State and two foreign corporations.  Plaintiff is a New York corporation with its principal place of business in New York, New York.  IGLD and the Debenture Trustee are Israeli companies with IGLD's principal places of business in Ramat Gan, Israel and the Debenture Trustee's principal place of business in Tel Aviv, Israel.

10.     Personal jurisdiction exists over IGLD and the Debenture Trustee pursuant to the agreement of the parties and because certain of Defendants' actions at issue occurred in this District.  In the Engagement Agreement, IGLD agreed to "irrevocably submit to the exclusive jurisdiction and convenient venue of any court of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York for the purpose of any suit, action or other proceedings arising out of or related to this letter agreement (or Annex A)."   The Debenture Trustee is similarly bound by the Engagement Agreement both because it adopted that contract and because its interests are so closely-related to, and predicated on, those of IGLD such that this provision is also enforceable against the Debenture Trustee.

11.     Venue is proper in this federal judicial district pursuant 28 U.S.C. § 1391 based on the parties' agreement and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## THE PARTIES

12.     Plaintiff Oppenheimer & Co. Inc. ("Oppenheimer" or "Plaintiff") is a New York corporation with its principal place of business in New York, New York.  Oppenheimer is an investment bank that provides emerging growth and mid-sized businesses with strategic advisory

services and capital market strategies.

13. Upon information and belief, defendant Internet Gold-Golden Lines Ltd. ("IGLD") is an Israeli corporation with its principal place of business in Ramat Gan, Israel. IGLD controls a leading telecommunications group in Israel and its shares trade on the Tel Aviv Stock Exchange ("TASE") and NASDAQ Global Market Select exchange ("NASDAQ"). IGLD owns approximately 52% of non-party BCOM.

14. Upon information and belief, defendant Reznik Paz Nevo Trusts Ltd. is an Israeli company with its principal place of business in Tel Aviv, Israel. It serves as the Debenture Trustee of the Series C and Series D debentures issued by IGLD.

15. Upon information and belief, non-party BCOM is an Israeli corporation with its principal place of business in Ramat Gan, Israel. BCOM is controlled by IGLD and its shares trade on TASE and NASDAQ. BCOM owns approximately 26% of non-party Bezeq Israeli Telecommunications Corp Ltd., which gives it a controlling interest under an Israeli Ministry of Communications control permit.

16. Upon information and belief, Bezeq Israeli Telecommunications Corp Ltd. ("BEZQ") is an Israeli corporation with its principal place of business in Tel Aviv, Israel. IGLD controls BCOM which in turn controls BEZQ. BEZQ's shares trade on TASE. BEZQ wholly owns subsidiaries that provide Internet service provider services, cellular telephony services, fixed line telephony services, international telephony services, fixed line broadband Internet infrastructure access services, international and domestic data transfer and network services, pay television services and other communication infrastructures and services. BEZQ is one of the leading telecommunications companies in Israel by market share.

## FACTUAL BACKGROUND

17.     In or before early 2018, IGLD began exploring a potential sale of its majority stake in BCOM.  Because IGLD's 52% interest in BCOM would give the purchaser a controlling interest in BEZQ subject to an Israeli Ministry of Communications control permit, IGLD expected that there would be significant interest in the sale.  IGLD sought proposals from a number of investment banks and strategic advisors.

### A.  IGLD Engages Oppenheimer

18.     In the fall of 2018, IGLD retained both a U.S. financial advisor and a local financial advisor to pursue the sale of its stake in BCOM.  IGLD concurrently retained Oppenheimer and a subsidiary of Migdal Capital Markets as financial advisors in or around the end of October 2018.

19.     On or about October 31, 2018, IGLD and Oppenheimer entered into an agreement (the "Engagement Agreement") engaging Oppenheimer "to act as the Company's co-financial advisor".  A copy of the Engagement Agreement is attached hereto as Exhibit ("**Ex.**") 1.

20.     Specifically, the Engagement Agreement provides that Oppenheimer will advise IGLD "in connection with the possible sale or other transfer, directly or indirectly and whether in one or a series of transactions, of all or a portion of the Company's holdings in B-Communications Ltd. ('**BCOM**') representing control (*i.e.*, in excess of 50% of the outstanding shares) of BCOM, regardless of the form or structure thereof (the '**Transaction**')."  *Id.* at p. 1.

21.     Oppenheimer agreed to provide IGLD with "financial advice and assistance in connection with the Transaction, which may involve, to the extent requested by the Company and appropriate for the Transaction, advice and assistance in connection with defining strategic and financial objectives, reviewing the Company's historical and projected financial statements,

identifying potential parties to the Transaction, assisting in the preparation of a confidential memorandum and related materials describing the Company and its business for distribution to prospective acquirers and assisting in negotiating financial terms and structure of the Transaction." *Id.*[1]

22.     The Engagement Agreement provides, in pertinent part, for the following compensation to Oppenheimer:

> *Compensation.*   In connection with this engagement, the Company agrees to pay Oppenheimer in cash:
>
> > (a) if the Company requests in writing that Oppenheimer deliver an Opinion, an opinion fee of $500,000 payable on Oppenheimer's delivery of the opinion, plus
> >
> > (b) a transaction fee of $1,500,000 payable on the closing date of the Transaction if, during the Engagement Term the Company consummates a Transaction or enters into an agreement and subsequently consummates a Transaction.
>
> If during a period of 12 months following the Engagement Term, the Company enters into a Transaction and subsequently consummates a Transaction with a purchaser that Oppenheimer or the Company contacted, that contacted the Company or Oppenheimer, or that expressed interest in a Transaction during the Engagement Term, Oppenheimer shall be entitled to the fees specified in (b) above, unless this [Engagement] Agreement was terminated by Oppenheimer prior to the closing of a Transaction.

Ex. 1 at pp. 2-3.

23.     The Engagement Agreement further provides that the "parties irrevocably submit to the exclusive jurisdiction and convenient venue of any court of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York for the purpose of any suit, action or other proceeding arising out of or related to this letter agreement (or Annex A)." *Id.* at p. 5.

24.     New York law governs the contract and any related matters.  Ex. 1 at p. 4.

---

[1]     Oppenheimer also agreed to render a written fairness opinion in connection with the Transaction if requested by the Board of Directors of IGLD.  *Id.* at pp. 1-2.

25.     The term of the Engagement Agreement was from October 31, 2018 until three (3) business days following receipt of written notice from the other party terminating the agreement. Ex. 1 at 3.

26.     IGLD has never terminated the Engagement Agreement.

**B. IGLD Agrees To A Transaction With Searchlight Capital Partners**

27.     Following the engagement by IGLD, Oppenheimer and the local advisor reached out to multiple potential purchasers of IGLD's shares of BCOM, including Searchlight Capital Partners L.P. ("Searchlight"). A targeted group provided non-binding offers for IGLD's entire holdings in BCOM. Searchlight was one of the parties providing non-binding offers. The interested purchasers were required to submit final bids by mid-January 2019.

28.     However, before those bids were due, BEZQ announced that it was considering classifying its subsidiaries' activities as separate from its own which could lead to materially writing down the value of its subsidiaries (later calculated at approximately 1.5 Billion Israeli Shekels (NIS)). This announcement had a negative effect on the bids that were to be submitted. BEZQ subsequently announced in March that, in light of its determination that such a write down was required, BEZQ changed its dividend policy and stopped the payment of dividends.

29.     In a U.S. Securities and Exchange Commission ("SEC") filing dated January 16, 2019, IGLD reported, in pertinent part, that:

The submission of binding bids ended on January 15, 2019, but Company [IGLD] did not receive any binding offers to purchase its holdings in Bcom. In addition, an indication that was presented to the Company by the final submission date was also significantly lower than those received by the Company during the initial bidding process which were much higher. The sale of Bcom shares held by the Company, at the price reflected in such indication, would not have enabled the full redemption of the Company's liabilities to its creditors.

On January 16, 2019, the Company's Board of Directors discussed the results of the auction and based on the opinion of the Company's consultants, estimated that the results of the auction and the non-binding offers were adversely affected by the current stock prices of Bcom and Bezeq,

which traded significantly lower over the past few weeks and specifically the last few days. ***The Board believes that the stock price decreased, because, among other reasons, the market terms, the estimate of receiving a smaller amount of dividends from Bezeq, the sale of Bezeq shares by foreign investors as well as certain actions taken by Bezeq, which resulted in a credit rating downgrade of Bcom.***

The Company's Board continues to explore the possibility of selling its Bcom shares, continues with discussions with the potential bidders, and continues to explore possibilities for strengthening the Company's capital structure ***and other options that are constantly discussed with the Company's financial and legal advisors. The Board notes that the Company has sufficient reserves to service its debt in 2019.***

At the same time, in light of the above, the Company's Board resolved that it has a responsibility to update the holders of the Company's debentures, while holding discussions with the debenture holders regarding the continued examination of the options available to the Company in such a way as to avoid harming both the holders and the underlying asset and the licenses associated with it, and the viability of a transaction to sell the Company's holdings in Bcom. (Emphasis added)**.**

30.    BEZQ's anticipated inability to pay dividends also had a negative effect on IGLD and the non-party corporations.  IGLD and BCOM are both heavily indebted.  Upon information and belief, in order to meet their debt service payments, IGLD and BCOM rely on the cash flow from dividends paid by BEZQ.

31.    As set forth in the January 16, 2019 SEC filing, IGLD's Board of Directors resolved to open an immediate dialogue with IGLD's Series C and Series D debenture holders (the "Bondholders").  Later that day, IGLD announced that it was withholding payments to the Bondholders until further notice "[c]onsidering the liquidity balances of the Company and the need to maintain the value of its assets".

32.    On or about January 29, 2019, the Bondholders elected Performance Capital Markets ("PCM") to act as a representative for the Bondholders pursuant to the Debenture Trustee's request to appoint a representative.  The Debenture Trustee immediately demanded that IGLD reduce its costs, which IGLD did.  Further, upon information and belief, the Bondholders through the Debenture Trustee and its representatives also began participating in

the negotiations for the sale of IGLD's stake in BCOM.

33.     Rather than terminate the Engagement Agreement, Defendants repeatedly indicated to Oppenheimer that they wanted to continue Oppenheimer's engagement.  To that end, in the beginning of February 2019, IGLD, counsel for the Debenture Trustee, and PCM requested a meeting with Oppenheimer at its New York offices in order to strategize and prepare for a subsequent meeting with Searchlight.   Thus, on February 7, 2019, IGLD and representatives of the Debenture Trustee met at Oppenheimer's offices in New York.  During those meetings and thereafter, IGLD and the Debenture Trustee (through its representatives) sought Oppenheimer's advice in connection with the strategy, negotiations and the terms sheet transmitted by Searchlight following the negotiations.  IGLD and the Debenture Trustee also requested that Oppenheimer join the meetings with Searchlight in New York, which it did.

34.     Doron Turgeman (IGLD's CEO), Ady Fighel (the Debenture Trustee's counsel) and Edward Klar of PCM were present at the February 7 meeting.  Neither of the Defendants informed Oppenheimer of any issue in its being paid its full Transaction Fee.

35.     At the end of March 2019, the Bondholders appointed Noked Capital as a second, joint representative.  IGLD then invited Oppenheimer to a meeting at Noked Capital's office on April 1.  Doron Turgeman (IGLD's CEO)  and Shlomi Bracha of Noked  Capital were present at the meeting with Oppenheimer.  During that meeting, the Debenture Trustee and IGLD solicited Oppenheimer's advice on how to proceed with Searchlight, including discussing Oppenheimer's suggested structure for the transaction.  Oppenheimer had proposed a deal structure whereby, among other things, Searchlight would acquire IGLD's BCOM shares and additionally invest directly in BCOM to strengthen its balance sheet.  This suggestion and structure became the basis for the continued negotiations between Searchlight and IGLD.

36.     On April 10, 2019, Searchlight transmitted a proposed term sheet (dated April 9) to IGLD, its representatives and Oppenheimer, which Searchlight superseded with an offer dated April 10.     IGLD, the Debenture Trustee and other representatives, further solicited Oppenheimer's advice in connection with the Searchlight offer and further negotiations both at meetings and in email communications.

37.     On June 24, 2019, IGLD announced that it had signed a definitive agreement with a purchaser group led by Searchlight regarding a transaction for the sale of IGLD's BCOM holdings (the "Searchlight Transaction").     This transaction was based on Oppenheimer's proposed structure.     As required by the agreement, IGLD commenced the Section 350 Proceeding shortly thereafter in order to obtain, among other things, Court approval for the Searchlight Transaction.

38.     On July 16, 2019, IGLD filed a Supplement to its Proxy Statement for the 2019 Annual and Extraordinary General Meeting of Shareholders ("Supplement") with the SEC.     The Supplement summarized the terms of the transaction and attached the Share Purchase Agreement ("SPA") between IGLD and Searchlight, among others.

39.     Notably, in IGLD's representations and warranties in the SPA, IGLD represents in a section entitled "Brokers' Fees" that "[n]o agent, broker, investment banker, or other Person acting in a similar capacity on behalf of or under the authority of the Seller is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, in connection with the transactions contemplated by this Agreement (including the sale and transfer of the Purchased Shares as contemplated under this Agreement), ***other than Oppenheimer & Co. Inc. and Migdal Capital Markets, for which the Seller shall be solely responsible.***" (emphasis added).

40.     The Searchlight Transaction required approval of IGLD's creditors and its shareholders in connection with IGLD's Section 350 Proceeding, including approval of the executed SPA, which IGLD provided with the proxy materials.  On July 30, 2019, IGLD announced that the creditors of IGLD, including the Bondholders, approved the Searchlight Transaction.  IGLD's shareholders approved the transaction at a special shareholders meeting on August 8, 2019.

41.     On August 20, 2019, IGLD reported that the Tel Aviv-Jaffa District Court had approved its petition to approve the Searchlight Transaction in the Section 350 Proceeding.

### C. IGLD and the Debenture Trustee Notify Oppenheimer That IGLD Will Not Pay The Transaction Fee

42.     At a meeting on July 17, 2019, Doron Turgeman of IGLD and Shlomi Bracha on behalf of the Debenture Trustee informed Oppenheimer that IGLD would not pay the full transaction fee, but that they might pay some discounted amount.

43.     On July 22, 2019, Oppenheimer sent a letter to IGLD care of its CEO Mr. Turgeman.  The July 22 letter informed IGLD that it would not accept a discounted transaction fee and reminded IGLD of its contractual obligations under the Engagement Agreement.  IGLD did not respond to the July 22 letter.

44.     On August 16, 2019, Oppenheimer sent another letter to IGLD.  The August 16 letter demanded that IGLD provide adequate assurance that it would comply with its contractual obligations in the Engagement Agreement, including specifically IGLD's obligation to pay Oppenheimer its full transaction fee of $1,500,000 USD upon the closing of IGLD's transaction with Searchlight.  Further, the August 16 letter makes clear that no response (or anything less than full and complete assurance of performance) by IGLD will be deemed a refusal by IGLD to perform its obligations under the Engagement Agreement.

45.     On August 20, 2019, Oppenheimer received an email from IGLD's CEO which did **not** confirm payment of the transaction fee or provide any adequate assurance that Oppenheimer would be paid in full.  Oppenheimer subsequently informed IGLD that its August 20 email did not provide adequate assurance as demanded.

46.     On September 19, 2019, Oppenheimer sent a letter to counsel for the Debenture Trustee and its representatives informing him that (i) the Debenture Trustee and its representatives had tortiously interfered with the Engagement Agreement, (ii) the Debenture Trustee and its representatives had engaged in unlawful conduct, including without limitation colluding with IGLD to obtain the services of Oppenheimer while diverting the funds owed Oppenheimer for the Debenture Trustee's own benefit and abusing the Israeli courts, and (iii) Oppenheimer had been damaged by the Debenture Trustee and its representatives' conduct.  To date, no response to this letter has been received.

47.     On September 23, 2019, Doron Turgeman, IGLD's CEO, responded to Oppenheimer and "disclaimed" all claims raised in Oppenheimer's September 19, 2019 letter.  In correspondence since then, IGLD has never affirmed or acknowledged that it would pay the full Transaction Fee.

48.     In a November 5, 2019 letter from BCOM's CEO to the Israeli Minister of Communications, BCOM states that "**[t]he Control Permit of the Minister of Communications is the last approval required to complete the [Searchlight] transaction.**" (Emphasis in original.)

49.     On November 10, 2019, BCOM stated in its filing with the SEC that "the Bezeq control Permit ('**Control Permit**') has not yet been signed by the Minister of Communication, *which is the only pending condition that has not been received and is required to close the*

*Arrangement* (Except for the conditions that are an integral part of the transaction closing procedures, such as securities offering processes, appointment of directors in the various companies, etc.)" (Emphasis added.)[2]

50.     On November 11, 2019, IGLD filed a report with the SEC that states that "the Company is very pleased to announce that the Bezeq new control permit for the 'Searchlight-TNR' group (the '**Control Permit**'), was signed this morning by the Minister of Communications."  BCOM's CEO further stated that the issuance of the Control Permit "'is the most important milestone in the completion of the transaction…'"  IGLD also filed a report with the SEC that the Control Permit had been issued and that IGLD "is currently in discussion with the Purchasers in order to finalize all remaining actions between issuance of the Control Permit and the closing of the transaction.".

51.     IGLD announced in its SEC filings that the anticipated Closing Date for the Searchlight Transaction is December 2, 2019.

## COUNT I – Anticipatory Breach of Contract
### (Against IGLD)

52.     Oppenheimer incorporates all previous allegations by reference as if fully restated herein.

53.     Oppenheimer and IGLD entered into a valid contract when they executed the Engagement Agreement (which was never terminated by IGLD).

54.     As set forth above, Oppenheimer has performed all of its material obligations under the Engagement Agreement.

---

[2]      Notably, BCOM's reports to the SEC define the SPA as the "Arrangement" and state that it was "entered into and among the Company [BCOM], Searchlight II BZQ L.P. ('**Searchlight**'), TNR Investments Ltd. ('**TNR**'), Internet Gold-Golden Lines Ltd., *the Company's and Internet Gold's debentures and their representatives and trustees*…" (Italics added).  IGLD's uses and cites this language in its own filings with the SEC.

55.     IGLD has anticipatorily breached the Engagement Agreement by unequivocally refusing to pay Oppenheimer's Transaction Fee in full as provided for in the Engagement Agreement.

56.     Further, given IGLD's potential insolvency, Oppenheimer made a reasonable demand for adequate assurance from IGLD that it would pay the Transaction Fee in full.  IGLD refused to provide any assurance whatsoever.

57.     Oppenheimer was at all times ready, willing and able to perform any further obligations under the Engagement Agreement.

58.     As a direct result of IGLD's anticipatory breach, Oppenheimer has been damaged by IGLD in an amount to be determined by the Court, but in no event less than the Transaction Fee of $1,500,000.

<u>**COUNT II – Injunction Ordering Specific Performance**</u>
**(Against Defendants)**

59.     Oppenheimer incorporates all previous allegations by reference as if fully restated herein.

60.     Oppenheimer and IGLD each entered into a valid contract when they executed the Engagement Agreement.

61.     The Engagement Agreement provides that the "parties irrevocably submit to the exclusive jurisdiction and convenient venue of any court of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York for the purpose of any suit, action or other proceeding arising out of or related to this letter agreement (or Annex A)."  Ex. 1 at p. 5.

62.     Further, the Debenture Trustee's interests and conduct in connection with the Engagement Agreement are directly related to, and predicated upon, IGLD's interests in the

Engagement Agreement. The Debenture Trustee has utilized Oppenheimer's services in connection with structuring and negotiating the Searchlight Transaction and has enjoyed the benefits of the Engagement Agreement. As set forth above, the Debenture Trustee is also "closely related" to IGLD as its largest creditor. Under these facts, the forum selection clause is enforceable against the Debenture Trustee.

63.     The forum selection clause is a critical, bargained for right in the Engagement Agreement.

64.     In statements and in filings with the SEC, IGLD has represented that it plans to commence another proceeding in Israel following the closing of the Searchlight Transaction.

65.     To the extent that IGLD intends to adjudicate any right or obligation under the Engagement Agreement in any such proceeding, it would be a breach of the forum selection clause.

66.     Any such breach of the forum selection clause would irreparably harm Oppenheimer.

67.     Oppenheimer requests that the Court issue a preliminary and permanent injunction preventing Defendants from (i) commencing, filing or seeking adjudication of any suit, action or other proceeding arising out of or related to the Engagement Agreement in any court, tribunal or proceeding (other than in a court of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York) ("New York Court"), (ii) making any motion, filing any document or taking any other action in the currently existing Section 350 proceeding in Israel or in any action or proceeding other than this proceeding that would cause any tribunal other than this Court to adjudicate or issue any ruling that would impair Oppenheimer's right to have its claims arising from or related

to the Engagement Agreement determined by a New York Court, and (iii) for such further order

that the Court deems just and equitable in order to preserve its jurisdiction over the determination

of the parties' rights and obligations under the Engagement Agreement.

**COUNT III – Tortious Interference with Contract**
**(Against the Debenture Trustee)**

68.     Oppenheimer incorporates all previous allegations by reference as if fully restated

herein.

69.     Oppenheimer entered into the Engagement Agreement, which is a valid and

enforceable contract between Oppenheimer and IGLD.

70.     The Debenture Trustee knew that IGLD had engaged Oppenheimer to, among

other things, act as its financial advisor advise IGLD "in connection with the possible sale or

other transfer, directly or indirectly and whether in one or a series of transactions, of all or a

portion of" IGLD's BCOM shares.

71.     Indeed, the Debenture Trustee (by its representatives) consented to IGLD's

retention of Oppenheimer and its services, and, in fact, participated in meetings with

Oppenheimer in connection with the Searchlight Transaction, including meetings at

Oppenheimer's New York office.

72.     Further, the Debenture Trustee knew, and was aware, of the terms of the

Engagement Agreement, including specifically the terms of compensation as demonstrated by

the Debenture Trustee's statements during the July 17 meeting.

73.     Upon information and belief, despite such knowledge and consent, the Debenture

Trustee intentionally and without justification caused IGLD to breach the Engagement

Agreement by, among other things, anticipatorily repudiating the obligation to pay the

Transaction Fee to Oppenheimer.

74.     Further, upon information and belief, the Debenture Trustee procured the aforementioned breaches through the use of wrongful and unlawful means, including without limitation by its misrepresentations, omissions and abuse of the Israeli courts.

75.     Upon information and belief, IGLD would not have breached the Engagement Agreement but for the Debenture Trustee's interference.

76.     As a result of the Debenture Trustee's tortious interference, Oppenheimer has been damaged in an amount to be determined by the Court, but in no event less than $1,500,000.00.

### COUNT IV – Unjust Enrichment
### (Against the Debenture Trustee)

77.     Oppenheimer incorporates all previous allegations by reference as if fully restated herein.

78.     Based on the Debenture Trustee's express and implied representations and conduct described herein, Oppenheimer devoted considerable time, energy and resources to lead a search for a buyer of IGLD's BCOM shares, pursue Searchlight, and negotiate aggressively to reach an agreement between IGLD and Searchlight.  Oppenheimer's efforts included performing under the Engagement Agreement, performing additional services beyond those contemplated by the Engagement Agreement once BEZQ wrote down the value of its assets, and performing additional services at the Debenture Trustee's request.  Indeed, Oppenheimer services proved very valuable and resulted in the Searchlight Transaction and execution of the SPA.

79.     The Debenture Trustee accepted Oppenheimer's services and was enriched by those services.

80.     Upon information and belief, by virtue of its unlawful coercion of IGLD to refuse to pay the Transaction Fee and other unlawful conduct, the Debenture Trustee will be unjustly

enriched by working with IGLD to retain for the benefit of the Debenture Trustee and Bondholders the funds owed to Oppenheimer.

81.     Equity and good conscience cannot allow the Debenture Trustee to adopt the Engagement Agreement and encourage Oppenheimer to provide services for its own benefit and then unlawfully divert Oppenheimer's compensation.

82.     Oppenheimer has been damaged and the Debenture Trustee has been unjustly enriched by its misconduct.  The Debenture Trustee is liable to Oppenheimer in an amount to be determined by the Court, but which is in no event less than $1,500,000.00.

## COUNT V – Lender Liability
### (Against the Debenture Trustee)

83.     Oppenheimer incorporates all previous allegations by reference as if fully restated herein.

84.     Upon information and belief, the Debenture Trustee, on behalf of the Bondholders, exercised control over IGLD in connection with the Searchlight Transaction and Section 350 Proceeding.  IGLD would not, and indeed did not, take any material action in pursuing the Searchlight Transaction without the approval of the Debenture Trustee because the Debenture Trustee represents the vast majority of the creditors of IGLD.  Thus, the Debenture Trustee, on behalf of the Bondholders, effectively controls IGLD in connection with the Engagement Agreement and Searchlight Transaction.  Indeed, as set forth above, BCOM's filings with the SEC (and IGLD's filings quoting those reports) state that the Debenture Trustee is a party to the SPA, referred to as the "Arrangement," that was "entered into and among the Company [BCOM], Searchlight II BZQ L.P. ('**Searchlight**'), TNR Investments Ltd. ('**TNR**'), Internet Gold-Golden Lines Ltd., *the Company's and Internet Gold's debentures and their representatives and trustees*…" (Italics added).

85.     The Debenture Trustee used its control of IGLD in order to cause IGLD to, among other things, (i) refuse to pay Oppenheimer its Transaction Fee pursuant to the Engagement Agreement, (ii) abuse the Israeli court system in connection with its Section 350 Proceeding and its proposed second creditors' arrangement that intends to file after the Searchlight Transaction closes, and (iii) make numerous misrepresentations and omissions to Oppenheimer (and other third parties) on which it relied to its detriment.

86.     The Debenture Trustee's control of IGLD caused it to perpetrate these unlawful acts and is the proximate cause of Oppenheimer's damages.

87.     Oppenheimer has been damaged by the Debenture Trustee's misconduct and the Debenture Trustee is liable to Oppenheimer in an amount to be determined by the Court, but which is in no event less than $1,500,000.00.

## COUNT VI – Indemnification
### (Against IGLD)

88.     Oppenheimer incorporates all previous allegations by reference as if fully restated herein.

89.     Pursuant to the Engagement Agreement, IGLD agreed that "[i]n addition to any rights of indemnification or contribution set forth above, the Company agrees to reimburse each Indemnified Party for all documented out-of-pocket costs and expenses as they are incurred (including, without limitation, *fees and expenses of outside counsel*) in connection with investigating, preparing or settling any Proceeding *involving the enforcement of this letter agreement*." Ex. 1, Annex A at p. 2 (emphasis added).

90.     In the lead up to and by filing the instant action, Oppenheimer has incurred fees and expenses in order to enforce the Engagement Agreement.

91.     IGLD is obligated to pay any and all such attorneys' fees, costs and expenses.

92.     Accordingly, Oppenheimer seeks indemnification from IGLD for its out-of-pocket costs and expenses, including attorneys' fees and their costs in investigating, preparing and bringing the instant action to enforce the Engagement Agreement in an amount to be determined by the Court.

WHEREFORE, plaintiff Oppenheimer & Co. Inc. respectfully requests that this Court grant them relief against defendants Internet Gold-Golden Lines Ltd. and Reznik Paz Nevo Trusts Ltd. as follows:

i.      Award Plaintiff a judgment in its favor on its anticipatory breach of contract cause of action, including monetary damages of no less than $1,500,000;

ii.     Issue an injunction preventing Defendants from (i) commencing, filing or seeking adjudication of any suit, action or other proceeding arising out of or related to the Engagement Agreement in any court, tribunal or proceeding (other than a New York Court), (ii) making any motion, filing any document or taking any other action in the currently existing Section 350 Proceeding in Israel or in any action or proceeding other than this action that would cause any other tribunal to adjudicate or issue any ruling that would impair Oppenheimer's right to have its claims arising from or related to the Engagement Agreement determined by a New York Court, and (iii) for such further order that the Court deems just and equitable in order to preserve its jurisdiction over the determination of the parties' rights and obligations under the Engagement Agreement;

iii.    Award Plaintiff a judgment in its favor on its tortious interference cause of action, including monetary damages of no less than $1,500,000;

iv.     Award Plaintiff a judgment in its favor on its unjust enrichment cause of action, including monetary damages of no less than $1,500,000;

v.      Award Plaintiff a judgment in its favor on its lender liability cause of action, including monetary damages of no less than $1,500,000;

vi.     Award Plaintiff its out-of-pocket costs and expenses, including attorneys' fees and their costs in enforcing the Engagement Agreement pursuant to IGLD's agreement to indemnify Oppenheimer;

vii.    Award Plaintiff pre- and post-judgment interest on any monetary judgment at the statutory rate; and

    viii.     That the Court grants such other and further relief to Plaintiff that is fair and equitable under the law.

Dated: November 21, 2019
       New York, New York

                       OPPENHEIMER & CO. INC.

                       By:_____*/s/Justin M. Garbaccio*_____
                           Justin M. Garbaccio, Esq. (JG 5907)
                       85 Broad Street, 25th Floor
                       New York, New York 10004
                       Tel.  (212) 667-6379
                       Justin.garbaccio@opco.com

                       *Counsel for Plaintiff Oppenheimer & Co. Inc.*